(October 8, 1912.)

STATE ex rel. JUDSON SPOFFORD, Plaintiff, v. WIL-
FRED L. GIFFORD, as Secretary of State of the State
of Idaho, Defendant, and J. H. GIPSON, Intervenor.

[126 Pac. 1060.]

ELECTION LAWS—PRIMARY NOMINATIONS—CONVENTION NOMINATIONS—
NOMINATIONS BY PARTIES—STATE TICKET—PRESIDENTIAL ELECTORS
—CANDIDATE FOR CONGRESS.

(Syllabus by the court.)

1. Under the provisions of sec. 1 of the direct primary election
law of this state (1909 Sess. Laws, p. 196) a political party is an
affiliation of electors representing a political organization under a
given name, which at the last preceding general election cast for
any candidate on their ticket for office within the state at least ten
per cent of the total vote cast for all candidates for the same
office within the state, and all political parties coming within this
definition are required to make nominations at the direct primary
election held on the last Tuesday in July of election years.

2. Under the provisions of sec. 11 of the direct primary law
"any organization of electors not governed by the terms" of that
act must hold their conventions for the nomination of candidates
on the same day that the direct primary election is held.

3. "Convention," as used and employed in the direct primary
election law, means an organized body of delegates or representa-
tives assembled for the purpose of making nominations, and does
not have reference to a mass meeting or assemblage of persons who
represent themselves only, but is intended to be an assemblage or
body selected or appointed by some class, body or party of electors
as representatives of the people, party or district making the
selection or appointment.

4. Under the provisions of sec. 385, Rev. Codes, candidates for
state offices, district offices and county offices, may be nominated
by petition, provided the required number of signatures designated
by statute be obtained of qualified electors who have not joined
in the nomination of any other person for the same office.

5. Under the provisions of secs. 385 and 386, Rev. Codes, per-
sons nominating candidates for public offices by petition are au-
thorized to "designate in not more than five words the party name
or principle" which they desire to give the ticket so nominated, and

where the required number of electors signing a petition for the nomination of candidates for public office designate the name of the ticket "The Electors' Progressive Party," such name or designation is not in conflict with the name of an organized party called the "Progressive Party." (*Phillips v. Curtis,* 4 Ida. 193, 38 Pac. 405, followed.)

6. Courts will not go into the realm of politics to inquire into the motives of electors for seeking or advocating the nomination or election of any person to office, and will not inquire into or investigate the motives or purposes of any person in either circulating or signing a petition for the nomination of a candidate to public office.

7. The statutes of this state do not authorize or permit the nomination of candidates for presidential electors or candidates for Congress by petition.

8. The only method provided by the statute of this state for nominating candidates for Congress is, first, by political parties under the direct primary election law, and second, by organizations holding conventions on the day of the direct primary election.

9. The only method provided by the laws of this state for nominating candidates for presidential electors is, first, by the state central committee of an organized political party, and second, by an organization not governed by the direct primary election laws holding a convention on the day of the direct primary in conformity therewith.

Original action for restraining order enjoining and restraining the secretary of state from certifying nominations. Granted in part and denied in part.

A. A. Fraser, for Plaintiff.

Under sec. 382, the Progressive party was entitled to hold a convention for the nomination of state officers. Sec. 385 has no application whatever to an organized assemblage of electors, but was intended only to permit of the filing of independent candidates for public office by the number of electors mentioned in the statute, said electors not being an organized body of electors. (*State ex rel. Russell v. Tooker,* 18 Mont. 540, 46 Pac. 530, 34 L. R. A. 315; *State ex rel. Woody v. Rotwitt,* 18 Mont. 502, 46 Pac. 370; *Partridge v. Devcto,* 143 Cal. 167, 82 Pac. 775.)

John J. Plowhead, H. E. McElroy, and Harry S. Kessler, for Intervenor.

Nomination by electors' certification of nomination—by required number of electors that were without organization prior to the time that a convention might have been called—has been approved in at least two Idaho cases. (*Phillips v. Curtis*, 4 Ida. 193, 38 Pac. 405; *Williams v. Lewis*, 6 Ida. 184, 54 Pac. 619.)

An organized assemblage must nominate by convention and cannot nominate by petition. (*State v. Rotwitt*, 18 Mont. 502, 46 Pac. 370; *State v. Reek*, 18 Mont. 561, 46 Pac. 442; *State v. Tooker*, 18 Mont. 540, 46 Pac. 530, 34 L. R. A. 315; *State v. Elliott*, 17 Wash. 18, 48 Pac. 734; *State v. Weir*, 5 Wash. 82, 31 Pac. 417; *Curtis v. Phillips, supra.*)

In *Phillips v. Curtis* the "People's Party" had a ticket in the field and had legally appropriated that name. The electors by petition placed a candidate in the field under the designation of "Electors' People's Party." The court directed the filing of the name under that designation.

It will thus be seen that it is the intention of the law to give each individual voter the opportunity of voting for any ticket presented by a political party or presented by electors representing, not a political party, but some political principle. The law then provides for party tickets and for independent tickets representing some distinctive principle. (*Williams v. Lewis, supra; Partridge v. Devoto*, 148 Cal. 167, 82 Pac. 775.)

D. E. Hodge, *Amicus Curiae.*

A penal statute cannot be extended by implication or construction. It cannot be made to embrace cases not within the letter, though within the reason and policy, of the law. (Lewis' Sutherland Stat. Const., sec. 521.)

The rule *expressio unius exclusio est alterius* is applicable to this case. The legislature specifically provided for the lesser political organizations by referring them to existing laws; then, in order to preserve the harmony and constitutionality of the primary law, selected by mention a certain

means known to existing law; and having so expressed its approval of the one method—conventions on call—and modified it so as to conform to the spirit of the primary law, excluded all other methods.

D. C. McDougall, Attorney General, files no brief.

### STATEMENT OF FACTS.

This action was instituted in the name of the state as plaintiff on the relation of Judson Spofford. After alleging the official position held by the defendant and that relator is a qualified elector of the state, the complaint alleges that on about the 3d of August, 1912, a national convention was held in the city of Chicago which was duly organized, consisting of delegates from most of the states of the Union, and that such convention adopted a platform and declaration of principles, and candidates for President and Vice-President of the United States were nominated, and that during the session thereof an organization was perfected and a party name was adopted whereby the organization assumed and appropriated the name of "Progressive Party"; that prior thereto and on the 30th day of July, 1912, an organization of electors of the state of Idaho, not governed by the terms of the direct primary law of this state adopted in 1909 (1909 Sess. Laws, p. 196), held a convention in the city of St. Anthony of this state, at which delegates from a number of counties of the state, composed of fifty or more persons, formed an organization which they designated the "Progressive Party of the State of Idaho," and thereupon elected delegates to attend the above-named convention, to be held in the city of Chicago on August 3d, and at the same time nominated three candidates for electors for President and Vice-President of the United States, and thereupon declined and refused to make further nominations, and selected certain committeemen to represent such party organization and empowered and instructed them to organize and represent such party, and thereupon adjourned; that thereafter and on the 12th of August, 1912, such committee met in the city of Boise and organized

by electing J. H. Gipson chairman of the Progressive party state central committee, and that thereupon the committee agreed upon certain persons for nomination for certain state offices, and that thereafter J. H. Gipson, as chairman of the Progressive party, caused a certificate of nomination to be prepared and printed and circulated nominating the persons so agreed upon for the respective state offices therein designated; and that thereafter he caused and procured these petitions to be circulated throughout the state and subsequently presented the same to the secretary of state for filing, and that the secretary thereupon filed the same. The petition circulated and subsequently filed is in the following words:

## "CERTIFICATE OF NOMINATION BY ELECTORS.

"We, the undersigned qualified electors of the State of Idaho, who are not entitled to nominate candidates for the public offices named below under the Primary Election Laws of Idaho, and who have not joined in the nomination of any candidate for any office herein mentioned, do hereby certify for nomination as candidates for public office in the State of Idaho, under the party designation of the electors' PROGRESSIVE PARTY the names of the following persons to fill the offices set above their names, to wit:

"*For Electors for President and Vice-President of the United States.*

"H. HARLAND, Residence, Payette, Canyon County, Idaho, Business, Farmer.

"HENRY C. OLNEY, Residence, Sandpoint, Bonner County, Idaho, Business, Real Estate.

"ELI M. HARRIS, Residence, Marysville, Fremont County, Idaho, Business, Farmer.

"L. M. EARL, Residence, Idaho Falls, Bonneville County, Idaho, Business, Mgr. Investment Co.

"*For Congress.*

"P. MONROE SMOCK, Residence, New Plymouth, Canyon County, Idaho, Business, Farmer and Fruit Grower.

## "*For Governor.*

"G. H. MARTIN, Residence, Sandpoint, Bonner County, Idaho, Business, Lawyer.

## "*For Lieutenant-Governor.*

"T. O. BOYD, Residence, Twin Falls County, Idaho, Business, Surgeon.

## "*For Secretary of State.*

"O. V. BADLEY, Residence, Caldwell, Canyon County, Idaho, Business, Real Estate.

## "*For State Treasurer.*

"JOHN E. YATES, Residence, Boise, Ada County, Idaho, Business, Capitalist.

## "*For State Auditor.*

"C. C. MILES, Residence, Webb, Nez Perce County, Idaho, Business, Farmer.

## "*For Attorney-General.*

"ADAM BARCLAY, Residence, Jerome, Lincoln County, Idaho, Business, Lawyer.

## "*For Inspector of Mines.*

"F. H. SKEELS, Residence, Kellogg, Shoshone County, Idaho, Business, Mining Engineer.

"NAMES OF ELECTORS.    RESIDENCE.    BUSINESS."

Printed across the back or outside of this petition are the following words:

## "DIRECTIONS.

"Use one petition in each precinct.

"Have each voter sign his or her own name and write in place of residence and business.

"Do not do this for them.

"Do not permit any person to sign the certificate who voted at the primaries.

"After you have secured all signers possible in your precinct, take certificate to the Registrar of the Precinct and have him fill out and sign the 'Certificate of Registrar' on back of the Certificate of Nomination.

"Then sign and swear to the affidavit on back of certificate and immediately mail the same to J. H. Gipson, Chairman Progressive State Committee, Boise, Idaho.

"These certificates with all the signers obtained in your precinct, must be in the hands of the State Chairman not later than September 20th, 1912.

"J. H. GIPSON,
"Chairman Progressive State Committee."

This petition was signed by upward of 600 duly qualified electors of the state, who certified that they had not previously joined in the nomination of any candidate for any office designated in the petition. The foregoing petition, as it shows upon its face, sought and asked to have the candidates therein and thereby nominated appear on the official ballot under the name of "The Electors' Progressive Party."

The relator alleges that the secretary of state is about to certify this ticket to the several county auditors of the state to be printed upon the official ballot for the coming general election, and that the persons so nominated are making the campaign and representing themselves as the candidates of "The Progressive Party" of the state, and that if the ticket is so certified and printed, it will tend to deceive, mislead and confuse many electors of the state, and that "in order that he, in common with all other voters, may not be confused and perhaps imperiled by having the ballot weighed down by other candidates which are illegal and can serve no other purpose than to delay, mislead and confuse them in the exercise of their rights at the ballot box, the secretary of state be restrained and enjoined from certifying this so-called Electors' Progressive party ticket, and that the same be declared illegal and void."

A demurrer has been filed to this petition, and prior to the argument thereof, J. H. Gipson, "on behalf of himself and the signers to the petition" designated in plaintiff's complaint

as "The Electors' Progressive Party" ticket, asked leave and was permitted to file an answer in intervention. He alleges that the relator, Spofford, is not a member of or affiliated with the Progressive party or the Electors' Progressive party, but is, on the contrary, a member of and affiliated with the Republican party, and that therefore he can have no interest in the filing of the Electors' Progressive ticket and cannot be "confused" thereby. The intervenor denies that a *convention* of the Progressive party was held at St. Anthony on July 30, 1912, but admits that a *mass meeting* or *mass convention* was held there on that day for the purpose of organizing a Progressive party in the state of Idaho, and that persons met there, not as delegates or representatives of any county, district, or organization, but as individuals from some nine counties of the state and to the number of about fifty, and organized what they designated a Progressive party, and that they elected delegates to attend the Chicago convention of the Progressive party, and that they nominated three presidential electors, but that they did not certify the names of the nominees to the secretary of state, and that such names have not been certified by the officers of the organization or by anyone, and that the time has expired for certifying such nominations.

In addition to the foregoing facts alleged by the complaint and answer in intervention, it is stipulated that the following facts are true: That fifty or more qualified electors of the state were present and took part in the St. Anthony meeting on July 30th and that a call for this meeting was issued, and that the call is in the following words:

"Responsive to the demands of the·people of the state of Idaho for the organization of a state Progressive party:

"Notice is hereby given to the qualified electors of the state of Idaho, who are interested in the Progressive movement, to attend and take part in a state convention to be held at St. Anthony, Idaho, on the thirtieth day of July, A. D. 1912, for the purpose of perfecting said organization, the nomination of three presidential electors and a full state ticket, also for the selection of delegates to the convention of the national

Progressive party to be held at Chicago, Aug. 5, 1912, the adoption of a platform and for the transaction of such other business as may be necessary.

                              "By Order of Committee."

It does not appear on what date this call was issued, but the stipulation shows that it appeared in the issue of the "Evening Capital News," Boise City, of July 19th. The call, while not signed by anyone, is admitted to have been issued by Wood D. Parker, publisher of the "Teton Peak Chronicle" at St. Anthony, who was at the time, as designated in the newspaper, "secretary-treasurer of the Progressive party, which was organized some time ago in Fremont county." The newspaper comment then runs as follows: "The call issued by the committee appointed by the Progressive party of Fremont county for that purpose is as follows."

It appears that at the same time this call was issued, a circular letter was also issued, addressed to "The Progressive voters and taxpayers of the state of Idaho," and in that letter the following explanation and reason is given for issuing the call:

"A call having been made by the Taxpayers' Progressive party of Fremont county for a convention to be held at St. Anthony, Idaho, on the thirtieth day of July, 1912, for the purpose of nominating a legislative and county ticket and in line with the universal demand for a progressive movement, and having received a telegram from Senator J. M. Dixon, and communications from numerous prominent citizens of Idaho requesting the organization of a Progressive party and the holding of a state convention at the same time and place for the purpose of nominating a state ticket, presidential electors and also to elect delegates to the national convention of the Progressive party to be held at Chicago, Aug. 5th, a call has been issued in accordance therewith, and all voters both men and women who are in sympathy with this movement are hereby invited and urged to attend said convention."

At that meeting this organization was perfected in part and was completed at Boise in August after the Chicago Pro-

gressive party convention. A ticket was agreed upon by adherents of the Progressive party faith, and the petitions were thereafter prepared and sent out over the state. The question now presented is their right to have the names of these nominees printed on the official ballot for the approaching general election.

AILSHIE, J. (After Stating the Facts.)—No question has been raised as to the original jurisdiction of this court to grant the relief sought herein, and so that question is not here involved.

It is conceded that what is known and here designated as the Progressive party is not a "political party" within the meaning of the primary election laws as defined by sec. 2 thereof (1909 Sess. Laws, 197). It is also admitted that it was not "an organization of electors" (sec. 11) *prior to July 30th,* the day of the primary election. It is likewise conceded that a Progressive party was organized at St. Anthony on July 30th, which was the day of the primary election. The primary election law does not provide for precinct nominations, and so does not provide for or recognize a "primary meeting" as designated in secs. 382, 383, and 385 of the Rev. Codes. It only recognizes a "convention" and requires *"all conventions* for the nomination of candidates" to be held on the day of the primary election. Sec. 11 reads as follows:

"Any organization of electors not governed by the terms of this act may nominate candidates in the manner provided by existing laws: Provided, that all conventions for the nomination of candidates to be voted for at a general election shall be held on the same day as the primaries are held under this law to nominate candidates for the same positions."

It is now contended by the relator that since a convention was held on July 30th and a Progressive party was then organized and nominations were then made, although not certified or filed, that electors cannot now make nominations for the same or a similar party by petition under sec. 385 of the Rev. Codes. The primary election law (1909 Sess. Laws,

p. 196) expressly repeals secs. 371 to 381, inclusive, of the Rev. Codes. Sec. 382 remains in force and is as follows:

"Any convention or primary meeting, as hereinafter defined, held for the purpose of making nominations to public office, and also electors to the number hereinafter specified, may nominate candidates for public office to be filled by election within the state. A convention or primary meeting, within the meaning of this chapter, is an organized assemblage of electors or delegates representing a political party or principle."

Sec. 383 provides what a certificate of nomination by a "convention or primary meeting" shall contain. Sec. 384 provides where certificates of nomination shall be filed and sec. 385 provides, among other things, as follows:

"Candidates for public office may be nominated, otherwise than by convention or primary meeting, in the following manner: A certificate of nomination, containing the name of a candidate for the office to be filled, with such information as is required to be given in certificates provided for in sec. 383, shall be signed by electors residing within the district or political division in and for which the officer or officers are to be elected, in the following numbers: The number of signatures, when the nomination is for a state office, shall not be less than three hundred. . . . . "

Relator insists that the St. Anthony meeting of July 30th was such a convention as is contemplated by sec. 11 of the primary act, and that electors as such cannot now appropriate that party name or a name so similar as to confuse voters and nominate a ticket by petition to be printed under the heading of "The Electors' Progressive Party." The intervenor denies that the St. Anthony meeting was a "convention" within the purview of the statute, and also insists that if it should be conceded that a legal convention was held, that under the decision of this court in *Phillips v. Curtis*, 4 Ida. 193, 38 Pac. 405, putting the words "The Electors' " before the words "Progressive Party" is sufficiently distinct and separate from the other party name, namely, the "Progressive Party," as

to entitle the ticket to be printed on the official ballot even if the "Progressive Party" had a ticket in the field.

Addressing our attention to the first proposition, we are of the opinion that the St. Anthony meeting was not a convention within the meaning of either the statute or common usage among political organizations in this country. A convention is an organized body of delegates or representatives assembled for some specified purpose. (Fiske, Civil Govt., p. 195; Standard Dict.; Oxford-English Dictionary by Murray; Black's Law Dictionary; 15 Cyc. 326; *State v. Johnson,* 18 Mont. 548, 46 Pac. 533, 34 L. R. A. 313.) A mass convention or assemblage does not represent anybody but the participants; it is not representative in any respect; it is purely democratic in the true sense of that term, and only represents the people participating. The word "convention" as employed in this country in common usage in statutes, political history, and civil government means and implies a representative gathering or assemblage. This is a representative government and all its institutions are founded on that principle. The participants in a convention are not expected to be self-selected, but, on the contrary, are supposed to have been selected or appointed by some class, body or party as representatives of the people, party or district making the selection or appointment. It follows, therefore, that some method must have been prescribed in advance to govern in the selection of the delegates or representatives who are to compose a convention. That was not done in this case, and it is conceded that there was no such party and no organization prior to July 30th which could have prescribed rules for or designate the means of selecting such delegates. It is insisted, on the contrary, that the St. Anthony meeting was called for the primary purpose of organizing a Progressive party in Idaho, and to select delegates to Chicago for the purpose of assisting in organizing a national party. Relator insists, however, that under the definition found in sec. 382 of the Rev. Codes a convention may be simply "an organized assemblage of electors." The last sentence of that section is as follows: "A convention or primary meeting, within the meaning of this chapter, is an organized

assemblage of electors or delegates representing a political party or principle.''

Let it first be remembered, as above suggested, that under the primary election law there is no such thing as a ''primary meeting'' and that precinct nominations cannot be made under that law. Under the old primary election law which was repealed by the 1909 primary election law, ''primary meetings'' were provided for making precinct nominations. A precinct is the smallest political subdivision of the state and is the political unit. The precinct meeting was not a convention but a meeting of all the electors of that political unit affiliating with the same party or representing the same principle. The precinct meeting is purely democratic and is in no way a meeting of delegates or representatives. Now the statute above quoted was attempting in one sentence to define both a ''convention'' and a ''primary meeting,'' and it never intended to treat them as synonymous. When read with the best care, it will be seen that it defines a ''convention'' as ''an organized assemblage of . . . . delegates representing a political party or principle,'' and defines a ''primary meeting'' as ''an organized assemblage of electors . . . . representing a political party or principle.'' It must be clear at once that the St. Anthony meeting was not a convention of delegates representing a political party or principle. The call was not issued by any person or committee having authority to call a convention, nor did the party or parties making the call represent any party or organization. Neither did the call provide for any delegates or representatives, but rather contemplated a ''mass meeting,'' which could only represent the parties attending. Sec. 11 of the primary election law in requiring ''organizations'' not governed by that law to hold conventions on the day of the primary election undoubtedly means ''organizations'' formed or existing prior to the date on which the convention should be held. It is hardly reasonable to assume that the lawmakers contemplated that an organization extending throughout the state and looking to the nomination of a state ticket could be formed in one day and representatives or delegates be elected in the same day to

represent the adherents of such organization in the party and hold a state convention on that day. In other words, it was never contemplated that the organization could be formed, the delegates or representatives to a convention be selected or appointed, and the convention held on one and the same date. A convention being a representative body, the law presumes that a *state convention* of any organization will represent at least 300 voters, and so requires the ticket to be certified and attested only by the officers of the convention, but where *no organization* exists and individual electors, each speaking for himself, desire to make nominations, the legislature has required that at least 300 electors join in the petition for a state ticket. (Secs. 383 and 385, Rev. Codes.)

In our opinion it is immaterial to a decision of this case whether the St. Anthony meeting was a legal convention or not, for the reason that the ticket to which relator objects is not a "Progressive Party" ticket but is named "The Electors' Progressive Party" ticket. The petitioners had the authority of a decision of this court sustaining such a change or rather similarity of name. In 1894 this court in the case of *Phillips v. Curtis* held that a candidate for state senator might be nominated by petition and have his name printed on the official ballot under the ticket heading: "Electors' People's Party," although there was at the same time a regularly organized "People's Party" in the state which had nominated candidates for state and county offices and had filed with the secretary a ticket designated "People's Party" ticket. That case has stood as the unquestioned law of this state for eighteen years, and in the meanwhile the legislature has never seen fit or deemed it advisable to change that rule or embody into statute any act that would indicate a desire to depart from that rule. Whatever we may individually think of the wisdom of the decision in that case, we have no right to depart from the rule there announced after electors have acted on the authority thereof. In this condition of the law as announced by the highest court of the state, the petitioners had a right to suppose that even if a Progressive organization had been formed, they could still lawfully use the words "Pro-

gressive Party'' if they preceded these words by the same word, ''Electors','' which was used in the Phillips-Curtis case and approved by this court. To make the parallel clear, we will set them opposite each other as follows:

| Phillips-Curtis case, approved by court; People's Party ticket nominated by organized party. Electors' People's Party ticket, nominated by petition. | This case, for consideration of court; Progressive Party ticket, nominated by St. Anthony meeting. Electors' Progressive Party ticket, nominated by petition. |
|---|---|

If the above name adopted and approved by this court was lawful and entitled to go on the official ballot in 1894, the name here presented is lawful and entitled to go on the ballot in 1912. If it was a sound rule of law in Populist days, it is sound these days. It is admitted that the law has not been changed in the slightest in this respect during all these years. *This position is strengthened and reinforced by the fact that no ticket has been filed, and it is admitted none can now be filed by the officers of the St. Anthony meeting, and so no ''Progressive Party'' ticket will be printed on the official ballot.* There will be no ''Progressive Party'' ticket. This meets the suggestion that the two names are so similar as to cause confusion among the voters even if the opinion had never been rendered in the Phillips-Curtis case. But the doctrine of the Phillips-Curtis case has been adopted by many courts. (*Craig v. Brown,* 114 Cal. 480, 46 Pac. 870; *State v. Johnson,* 18 Mont. 556, 46 Pac. 440; *State v. Arms,* 24 Mont. 447, 63 Pac. 401; *Social Dem. Ticket,* 105 App. Div. 243, 93 N. Y. Supp. 1023.)

Some question has been raised as to the motives of the persons or committee who caused these petitions to be prepared and circulated. We think it too fundamental to require discussion that a court will not go into the realm of politics to inquire into the motives of electors for seeking or advocating the nomination or election of any man to office. That is a political question and is what elections are held for, to discuss and consider principles, motives, and the conduct of public officers and of the public business. The reasons must

be various, and after a court has learned all the reasons, it will have a sorry task of telling what are good and what are invalid reasons for wanting a man nominated for office. And suppose the purpose of the one who proposes and circulates a petition were fraudulent or even criminal, what is to be said about the man who signs it—he knows nothing of the fraudulent or criminal purpose of the other fellow. This is sufficient to show the utter futility of a court undertaking to inquire into motives in this kind of cases. A man might support a candidate because he thought the candidate if elected would protect him in the commission of crime, but a court could not for that reason prevent the man voting or signing a petition for the candidate's nomination. Now suppose the Progressive party committee were acting fraudulently or wrongfully in preparing and circulating these petitions, no pretense whatever is made that anyone who *signed* the petition did so *wrongfully* or *fraudulently* or knew anything whatever of any wrongful or fraudulent *purposes* or *intentions* of this committee. Are these electors who are acting *honestly* and in *good faith* to be denied the right to have their petitions filed and certified simply because some man who either drafted or circulated or inspired the petition may have been acting *dishonestly* or engaging in political jugglery? We answer unqualifiedly, no. If that should be the rule of law, it might often prove disastrous to regular party nominees. Courts should be very careful, and we believe they have quite generally been careful, in not attempting to make law or prescribe rules and regulations to govern electors, organizations or political parties in the matter of making nominations of candidates for office. These things belong to the political department of the state government and should not be interfered with by the judiciary. Unless a clear statute has been violated or is about to be violated, courts will not intervene. They should not deny any body of electors the right to vote for candidates of their choice on questionable or doubtful authority. The fact that the action of some political organization or body of electors may prove detrimental to a political party or individual candidates, although it might be

regretted personally by members of the court, should not and cannot induce them, as a court, to reach out and restrain the political action and activities of any such class or body of electors.

It seems to us that the Montana case of *State v. Tooker,* 18 Mont. 540, 46 Pac. 530, 34 L. R. A. 315, relied on by counsel for relator, is against his position rather than in his favor. The court there held that an organized Silver Republican club composed of some 400 members could not make nominations *as a convention,* and that such a meeting was not a *convention* within the meaning of sec. 1310 of the Political Code of Montana which is substantially the same as sec. 382, *supra,* of our code. That court gives the following as reasons for its conclusions: "No primaries were ever held. No call for a convention was ever made, nor was any person ever elected a delegate to a convention, and no notice was given that a convention was to be held. . . . . To construe the proceedings of this club as a convention is contrary to all ideas of political conventions among the American people. The Silver Republican party, it was stated in the evidence, was a wing of the Republican party. If it were a wing, it naturally inherited the political practices of the Republican party. No one pretends that the Republican party had any such usages or customs, or ever held conventions in any such manner as this. . . . . The respondent's counsel earnestly argue that any number of men, however small, may organize a political party. This will not be denied at this time or place. But that is not the question for consideration. The question here is whether or not a political party held a convention. We have stated above our reasons for holding that the evidence shows that this was not a convention under the statute, or under the usages or customs of political parties."

*Partridge v. Devoto,* 148 Cal. 167, 82 Pac. 775, cited by relator, was decided by the California court under the provisions of a statute which does not exist in this state. Sec. 1188 of the Political Code of California which provides for nominations by petition and authorizes the petitioners to designate the "party name," says: "Provided, said name is not the

same or so similar to that of any existing party as to mislead voters." Under that provision, the court held that "Independent Republican" and "Independent Democratic" was so similar to the old party names of Republican and Democrat as to be confusing and misleading. The *same court,* however, had nine years previously in *Craig v. Brown,* 114 Cal. 480, 46 Pac. 870, held that the party designation of "National Democratic" was not confusing or misleading or liable to be taken for a "Democratic" ticket. (To same effect see *State v. Johnson,* 18 Mont. 556, 46 Pac. 440; *State v. Arms,* 24 Mont. 447, 63 Pac. 401; *In re Social Democratic Party,* 105 App. Div. 243, 93 N. Y. Supp. 1023.)

In the Partridge-Devoto case, the California court, in commenting on the purpose and object of the statute authorizing the nomination of candidates by petition, held that it was twofold in its objects. "It is intended," said the court, "in the first place, to permit absolutely independent nominations of persons as candidates who have no political affiliations with any party, and who do not intend to form a party, but who become candidates for reasons personal to themselves or to those who sign the certificates. In the second place, it is intended to facilitate the formation of new political parties, enabling such an organization to get a place on the ballot, and if, at the ensuing election, it receives as much as 3 per cent of the total vote, it thereafter takes its place as a regular and recognized political party, entitled to nominate candidates by a convention." The same might be said of our section 385.

If it were not for the statute, the candidates named on this petition would clearly not be entitled to have their ticket take or adopt any party name, but secs. 385 and 383, Rev. Codes, specifically authorize the adoption of a name composed of "not more than five words" which shall designate "the party or principle" represented by such ticket. This statute evidently intends to allow signers of petitions to adopt a name which they propose for the new organization or party which they are attempting to organize and under which they propose

to be known among the electors of the state, district or county in which they present their ticket.

Reverting again to the St. Anthony meeting; it must be admitted that those who participated in that meeting did not represent anybody but themselves, and they certainly represented no organization, for none existed prior to their attendance there. It is admitted that over 600 qualified electors who had not participated in nominating anyone else signed this petition, and that not over ten of them were present or participated in the St. Anthony meeting. The law only requires 300 signatures for a state nomination, and so these ten names might be stricken from the petition and still there would be enough left to satisfy the statute. In the Phillips-Curtis case this court held that signatures of persons not entitled to sign would not invalidate the petition if enough lawful signatures were left after striking off the illegal names.

It is contended that even if the nominations for state officers, as embodied in this certificate or petition, are valid, that nevertheless presidential electors and candidates for Congress cannot be nominated by petition. Sec. 1 of the direct primary law (1909 Sess. Laws, p. 196) provides that candidates for Congress and for all elective state, district, and county offices shall be nominated as therein provided, no provision whatever being made for the nomination of presidential electors. There is no provision in the primary election law for the nomination of presidential electors, and the nomination of such candidates is left to the state central committees of the respective existing political parties. Sec. 29 of the primary election law, as amended by act of March 7, 1911 (1911 Sess. Laws, p. 578), authorizes the state central committee of any political party to "provide for the nomination of candidates . . . . for offices not required to be nominated as herein specified." Sec. 385 of the Rev. Codes, which is still in force and effect and is not repealed by the direct primary act, provides that "candidates for public office may be nominated otherwise than by convention or primary meeting in the following manner." The statute then prescribes the manner of certifying such nominations, and says: "The

number of signatures, when the nomination is for a state office, shall not be less than three hundred; for a district office, or subdivision of the state including two or more counties, the number of signatures shall not be less than one hundred and fifty; for a county office, not less than fifty; and for a township, precinct or ward office, not less than ten.'' This, it must be remembered, is the statute providing for nominations by petition and not for convention or party nominations. It will therefore be seen that the statute nowhere names candidates for Congress or presidential electors, nor prescribes the number of signatures required for the nomination of a presidential elector or a candidate for Congress, nor does it prescribe the method or designate the manner of nominating a candidate for any office other than a state, county, district, township, precinct or ward office.

The office of congressman is clearly not a state office; it is provided for by the federal constitution, and the only thing left to the state to do is to hold the election (sec. 2, art. 1). Presidential electors are likewise provided for by the federal constitution (sec. 1, art. 2). The state provides the manner of appointment or election of electors, which has been done in this state by secs. 351 and 459 to 465 of our Rev. Codes. Here it has been provided that they shall be elected by popular vote throughout the state at large. It is clear, however, that when elected they are not *state officers,* and it follows, therefore, that no method has been provided by statute for nominating presidential electors by petition and that no authority exists for so doing. Such nominations may therefore be made under our statutes in any manner authorized by the state central committee of a political party, or at a convention as prescribed by sec. 11, *supra,* of the primary election law. As further emphasizing the fact that the legislature did not intend to include presidential electors and candidates for Congress when they used the words ''state officers '' in the election laws, we find that in sec. 7 of the primary election law, which provides the fees to be paid upon filing petitions, that the statute enumerates the different officers as follows: ''When the candidacy is for a congressional, state or district

office, embracing more than one county, the fee shall be paid,''
etc.; and nowhere does it name a presidential elector; sec. 8,
which provides the number of signatures necessary to procure
the printing of a name on the primary election ballot, says:
''For a state or congressional office by at least 3 per cent of
the voters,'' etc.    Again, in sec. 35 of the same act, in pre-
scribing the duties of the canvassing board it uses the words
''for a district or state office or member of Congress''; and,
again, in sec. 37, it says, ''Candidates for Congress, state and
district officers.''    Other citations might be made to the vari-
ous provisions of the primary election law, wherein the law-
makers have used the words ''candidates for Congress'' as
separate and distinct offices from what are designated ''state
offices''; all of which clearly indicate that when the legislature
used the words ''state officers,'' they did not include or intend
to include presidential electors or candidates for Congress.
The public officers of this state are classified by sec. 31, Rev.
Codes, as follows: ''1. Legislative; 2. Executive; 3. Judicial;
4. Ministerial officers and officers of the courts.''

Presidential electors belong to neither of these classes.    Sec.
32 of the Rev. Codes provides that the regular terms of state
officers shall commence on the first Monday of January next
after their election.    The term of members of Congress be-
gins on March 4th, and presidential electors have no regular
terms of office, but discharge their duties at one meeting.
(Sec. 461, Rev. Codes.)

Having treated ''candidates for Congress'' throughout the
direct primary election law and statutes of the state as sepa-
rate and distinct offices, which they are, from ''state offices,''
and then having omitted candidates for Congress and presi-
dential electors from sec. 385 of the statute, which authorizes
nominations for state offices by petition, it is evident at once
that the legislature has not intended to authorize the nomi-
nation of candidates for presidential electors and members
of Congress by petition, but has rather prohibited that method
of nomination of those officers.    The rule is too well recog-
nized and understood everywhere to even require repetition
that ''the expression of one thing is the exclusion of another.''

We are forced to conclude, therefore, that the nomination by petition of candidates for presidential electors and a candidate for Congress, as was done in this case, is without authority of law, and is in violation of the statutes of this state, and that the names of the nominees for these offices cannot be lawfully printed upon the official ballot.

No contention has been made by the relator that secs. 382 to 385, inclusive, Rev. Codes, are not still in force and effect and that nominations cannot in fact be made by petition, nor was that question mooted on the argument of the case. Since the argument, however, a brief has been filed by Dwight E. Hodge, an attorney of this court, in which he argues that the foregoing provisions of the Rev. Codes are impliedly repealed by the primary election law (1909 Sess. Laws, p. 576). This argument seems to be based upon the principal grounds that the primary election law limits the expense of candidates and requires them to file an itemized statement of their expenses, and makes it a misdemeanor for any person to violate the provisions of the act in this respect. Counsel argues that if this statute did not by implication repeal sec. 385 of the Rev. Codes, that then the penal provisions of the direct primary law are unconstitutional, in that it requires candidates of political parties to do certain things and penalizes them if they fail to do them, whereas it exempts those who are not adherents of such parties or who entertain a different political faith from complying with these provisions and being subjected to these penal statutes. This contention is not well taken, for the reason that the primary election law defines the organizations which constitute political parties within the meaning of the law, and it places certain restrictions upon persons who become candidates for nominations within these parties. It *applies alike to all who fall within that class, and this is not an arbitrary or unreasonable classification.* (*Mix v. Board of Commissioners,* 18 Ida. 695, 112 Pac. 215; *Idaho Mutual Co-op. Ins. Co. v. Myer,* 10 Ida. 294, 77 Pac. 628; 7 Cyc. 185; 8 Cyc. 1051.) Those who are adherents of organizations which have not reached the standing and dignity of political parties and who procure nominations

from such organizations through conventions and those who procure nominations by petition are not required to render an account of their expenditures and are consequently not subject to the penal provisions of the direct primary. Sec. 11 of the direct primary law relegates such parties and electors to the statutes which existed prior to the adoption of the primary act.

It is also argued by Mr. Hodge that sec. 385 of the Rev. Codes, which provides for nominations by petition, is inconsistent with the spirit and purpose of the direct primary law, in that it was the intention of the direct primary to have all nominations made on the same day whether by direct primary or convention. That is true and manifest by the statute as to conventions, but the same reason did not exist for making nominations by petition on the same day of the primary as existed for holding conventions on that day. Petition nominations are made by the persons who are not members or adherents of political parties or political organizations, and who have not participated either in the primary or in a convention; and, again, it would be difficult, and sometimes impossible, to secure the requisite number of signatures in the one day. This is guarded against, however, by the statute prohibiting anyone signing a petition who has participated in making a nomination for the same office in any other manner. The statute does not attempt to require petition nominations to be made on the day of the primaries.

After a most careful and diligent examination of our statutes and the other authorities which have been called to our attention and others which have not been cited, we are convinced that there now exist in this state three methods of nominating candidates for state offices: First, by primary election for a party nomination where the party cast for any candidate on their ticket at the last preceding election at least ten per cent of the total vote cast for all candidates for the same office within the state, and upon which ticket there were at least three nominees for state officers; second, by convention held on the same day of the primary election for all organizations of electors existing prior to that day

and not governed by the terms of the direct primary act; and, third, by petition, where the signers to the petition have not participated in the nomination of any person to that particular office, and where the nomination is not made for any political party governed by the direct primary act or by any existing organization of electors.

We conclude, therefore, that the nominees for state offices designated on the petition attached to the relator's complaint are entitled to have their names certified and printed on the official ballot, and that those named for presidential electors and the candidate for Congress have not been nominated in conformity with the statute, and should not be certified or printed on the official ballot. Judgment will be entered accordingly.

Stewart, C. J., and Sullivan, J., concur.